COAST LAW GROUP, LLP
Marco A. Gonzalez (State Bar No. 190832)
Chris C. Polychron (State Bar No. 230103)
Livia B. Beaudin (State Bar No. 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Tel: (760) 942-8505
Fax: (760) 942-8515
E-mail: marco@coastlawgroup.com
          livia@coastlawgroup.com

LOS ANGELES WATERKEEPER
Arthur Pugsley (State Bar No. 252200)
Melissa Kelly (State Bar No. 300817)
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178
E-mail: arthur@lawaterkeeper.org
          melissa@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PRIME METALS U.S.A., INC., dba PRIME METALS LOS ANGELES, a California corporation,<br><br>Defendant. | Civil Case No.: 2:17-CV-1221<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

1

COMPLAINT

LOS ANGELES WATERKEEPER ("LAW" or "Plaintiff"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.   **INTRODUCTION**

1.   This complaint seeks relief for Defendant Prime Metals U.S.A., Inc.'s (DBA Prime Metals Los Angeles) ("Prime Metals" or "Defendant") unlawful discharges of polluted storm water from Defendant's industrial facility located at 6069 Maywood Avenue, Huntington Park, California 90255 ("Facility") in violation of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ, as renewed by Order No. 2014-0057-DWQ (collectively referred to hereinafter as the "Permit" or "Storm Water Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

2.   With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

3.   Los Angeles area waters are ecologically sensitive areas, and although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Los Angeles area waters have for people in the surrounding communities. The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreation and aesthetic

2

opportunities, such as wildlife observation are also impaired by polluted discharges into Los Angeles area waters.

4.      Industrial facilities, like Defendant's, that discharge polluted storm water and non-storm water contribute to the impairment of downstream waters and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## II.   <u>JURISDICTION AND VENUE</u>

5.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

6.      On December 2, 2016, Plaintiff issued a sixty (60) day "Notice of Violation and Intent to File Suit letter ("Notice Letter") to Prime Metals for its violations of the Act, and of Plaintiff's intention to file suit against Defendant. The Notice Letter was also sent to the registered agent for Defendant, as required by 40 C.F.R. § 135.2(a)(1); the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"), as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of LAW's notice letter is attached as Exhibit A, and is incorporated by reference.

7.      More than sixty days have passed since notice was served on Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereupon

COMPLAINT

alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

8.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## III.   PARTIES

### A. Los Angeles Waterkeeper

9.     Plaintiff LAW is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 120 Broadway, Suite 105, Santa Monica, California 90401.

10.    Founded in 1993, LAW is dedicated to the preservation, protection, and defense of the inland and coastal surface and groundwaters of Los Angeles County from all sources of pollution and degradation.  LAW and its approximately 3,000 members are deeply concerned with protecting the environment in and around their communities, including the Los Angeles River Watershed.  To further these goals, LAW actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

11.    LAW's members use and enjoy the waters into which Defendant discharges polluted storm water.  These waters include the Los Angeles River, the Los Angeles River Estuary, the Los Angeles Harbor, and San Pedro Bay (collectively, "Receiving Waters"). LAW's members use and enjoy the Receiving Waters to swim, boat, kayak, bird watch, view wildlife, hike, bike, walk, and run. Additionally, LAW's members use the waters to engage in scientific study through pollution and habitat monitoring and restoration activities.  Defendant's discharges of pollutants into the Receiving Waters impairs LAW's members' uses and enjoyment of the Receiving

COMPLAINT

Waters.  Thus, the interests of LAW's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

12.   LAW brings this action on behalf of its members.  LAW's interest in reducing Defendant's discharges of pollutants into the Receiving Waters and requiring Defendant to comply with the requirements of the Storm Water Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of LAW.

13.   Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

**B. The Facility Owner and/or Operator**

14.   LAW is informed and believes and thereon alleges that Prime Metals U.S.A., Inc., DBA Prime Metals Los Angeles, is a private corporation organized under the laws of the State of California and is located in Fullerton, California.

15.   LAW is informed and believes and thereon alleges that Prime Metals U.S.A., Inc., DBA Prime Metals Los Angeles, is the owner and operator of the Facility located at 6069 Maywood Avenue, Huntington Park, California 90255.

16.   LAW is informed and believes and thereon alleges that the Prime Metals Facility was formerly operating as the Ace Recycling Facility, owned and operated by Ace Recycling LLC and/or Ace Metals, LLC.

17.   LAW is informed and believes that the name and address of the Registered Agent for Prime Metals is Ik Dong Kim located at 1440 North Harbor Boulevard #640, Fullerton, California 92835.

## IV.   STATUTORY BACKGROUND

**A. Clean Water Act**

18.   Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of

COMPLAINT

1   any pollutant into waters of the United States, unless such discharge is in compliance
2   with various enumerated sections of the Act.  The Act requires point source
3   discharges of pollutants to navigable waters be regulated by an NPDES permit. 33
4   U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).  Among other things, Section 301(a)
5   prohibits discharges not authorized by, or in violation of, the terms of an NPDES
6   permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

7        19.    Section 402(p) of the Act establishes a framework for regulating
8   municipal and industrial storm water discharges under the NPDES program.  33
9   U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by
10  Section 402(p) to regulate industrial storm water discharges through individual
11  permits issued to dischargers or through the issuance of a single, statewide general
12  permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

13       20.    The EPA promulgated regulations for the Section 402 NPDES permit
14  program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA
15  interprets waters of the United States to include not only traditionally navigable
16  waters but also other waters, including waters tributary to navigable waters, wetlands
17  adjacent to navigable waters, and other waters including intermittent streams that
18  could affect interstate commerce. The Act requires any person who discharges or
19  proposes to discharge pollutants into waters of the United States to submit an NPDES
20  permit application. 40 C.F.R. § 122.21.

21       21.    The Clean Water Act confers jurisdiction over non-navigable waters that
22  are tributary to traditionally navigable waters where the non-navigable water at issue
23  has a significant nexus to the navigable water. *See Rapanos v. United States,* 547 U.S.
24  715 (2006).  A significant nexus is established if the "[receiving waters], either alone
25  or in combination with similarly situated lands in the region, significantly affect the
26  chemical, physical, and biological integrity of other covered waters." *Id.* at 780.

27       22.    A significant nexus is also established if waters that are tributary to
28  navigable waters have flood control properties, including functions such as the

COMPLAINT

reduction of flow, pollutant trapping, and nutrient recycling. *Id.* at 783.

23.    Section 505(a)(1) of the Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1) and 1365(f).

24.    Prime Metals is a "person" within the meaning of section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

25.    An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).

26.    Each separate violation of the Act subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015; and up to $37,500 per day per for violations occurring violation occurring prior to and including November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §§ 19.1–19.4.

**B. California's Storm Water Permit**

27.    Section 402(b) of the Act allows each state to administer its own EPA-approved NPDES permit for storm water discharges. (33 U.S.C. § 1342(b)). California is a state authorized by EPA to issue NPDES permits.  In California, the State Board is charged with regulating pollutants to protect California's water resources.  Cal. Water Code § 13001.

28.    The State Board elected to issue a statewide general NPDES permit for industrial storm water discharges.  Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ ("1997 Permit"). On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Storm Water Permit was reissued ("2015 Permit"). The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. 2015 Permit, Findings, ¶ 6.

7

COMPLAINT

29.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the Storm Water Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).  Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board.  1997 Permit, Finding #3; 2015 Permit Findings, ¶ 17.

30.     Violations of the Storm Water Permit are violations of the Clean Water Act. 1997 Permit, Section C(1) (Standard Provisions); 2015 Permit, Section XXI(A) (Duty to Comply).

**C.  The Storm Water Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

31.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

32.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section V(A).

33.     The Storm Water Permit Effluent Limitations also require facility

8

operators in specific industrial categories to comply with Effluent Limitation Guidelines at 40 C.F.R. Chapter 1 Subchapter N. 1997 Permit, Effluent Limitation B(1); 2015 Permit, Sections I(K) and V(B).

34.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

35.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. See Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP), 2015, §§6.2.1, 8.N, Table 8.N-1). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. MSGP Fact Sheet, 52. Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. Id. at 65. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants. Id.

36.     EPA has established the following sector-specific benchmark values for Sector N, Scrap Recycling and Waste Recycling Facilities: chemical oxygen demand: 120 mg/L; total suspended solids 100 mg/L; aluminum: 0.75 mg/L; iron: 1.0 mg/L; copper: 0.0038 – 0.0332 mg/L[1]; lead: 0.014 – 0.262 mg/L[2]; and zinc: 0.04 – 0.26 mg/L[3].

37.     The Storm Water Permit Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. 1997

---

[1] The benchmark for copper is dependent on water hardness.
[2] The benchmark for lead is dependent on water hardness.
[3] The benchmark for zinc is dependent on water hardness.

COMPLAINT

Permit, Receiving Water Limitation C(1); 2015 Permit, Section VI(B).  Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the 1997 Permit and Section VI(B) of the 2015 Permit.

38.     The Storm Water Permit Receiving Water Limitations also prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan." 1997 Permit, Receiving Water Limitation C(2); 2015 Permit, Receiving Water Limitation VI(A).

39.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

40.     The Water Quality Control Plan, Los Angeles Region (*Basin plan for the Coastal Watersheds of Los Angeles and Ventura Counties), California Regional Water Quality Control Board, Los Angeles Region (4)* (adopted June 13, 1994, as amended) ("Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. The existing and/or potential Beneficial Uses for downstream of the point at which the Los Angeles River receives storm water discharges from the Facility (i.e., Los Angeles River Reaches 1 and 2, the Los Angeles River Estuary, Los Angeles Harbor, and San Pedro Bay) include, among others, municipal and domestic supply; groundwater recharge; water contact recreation; non-contact water recreation; warm freshwater habitat; wildlife habitat; wetland habitat; marine habitat, estuarine habitat; rare, threatened, or endangered species; migration of aquatic organisms; spawning, reproduction, and/or early development; commercial and sport fishing, and shellfish harvesting. Basin Plan, Table 2-1.

41.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. According to the 2012 (303)(d) of Water Quality

COMPLAINT

Limited Segments, Reach 2 of the Los Angeles River is impaired for trash, oil, ammonia, nutrients, pathogens, copper, and lead.  Reach 1 of the Los Angeles River is impaired for zinc, lead, copper, trash, pH, nutrients, and pathogens, among other pollutants.  The Los Angeles River Estuary is impaired for trash and sediment toxicity, among other pollutants.  The Los Angeles Harbor is impaired for copper, zinc, and sediment toxicity, among other pollutants. San Pedro Bay is impaired for sediment toxicity, among other pollutants.

42.    Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

43.    WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

44.    The Basin Plan sets forth, among other things, narrative WQS for floating material; oil and grease; solid, suspended, and settleable materials; and toxic substances, and sets forth numeric WQS for pH.

45.    The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." Basin Plan, 3-26.

46.    The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."  Basin Plan, 3-29.

47.    The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."  Basin Plan, 3-37.

48.    The Basin Plan provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."  Basin Plan, 3-38.

11

49.     The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5."  Basin Plan, 3-35.

50.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. The CTR limits are, in part, as follows: lead: 0.065 mg/L; copper: 0.013 mg/L; zinc: 0.12 mg/L. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals. 40 C.F.R. § 131.38.

51.     Discharges of pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of the Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

**D. The Storm Water Permit Storm Water Pollution Prevention Plan Requirements**

52.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, § A(1)(a) and E(2); 2015 Permit, §§ I(I) (Finding 54), X(B). The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, § A(2); 2015 Permit, § X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-stormwater discharges. 1997 Permit, § A(2); 2015 Permit, § X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, § A(2); 2015 Permit, §§ I(D), X(C).

53.     Sections A(3) through A(10) of the 1997 Permit and Sections X(A) through X(I) of the 2015 Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; storm water drainage areas with flow patterns; nearby water bodies; the location of storm water collection, conveyance and discharge system; a list of significant

12

materials handled and stored at the site; areas of industrial activity; areas of actual and potential pollutant contact; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective.

54.     The 1997 Permit and 2015 Permit set forth essentially the same SWPPP requirements, except that under the 2015 Permit, all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations. *See* 2015 Permit, § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table of each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  *See* 2015 Permit, §§ X(G)(2), (4), (5).  Section X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

55.     The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water

COMPLAINT

discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id*.

56.     The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, §§ A(9)(a)-(c); 2015 Permit, § XV.

57.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit.

58.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, § A(9); 2015 Permit, § X(A)(9).

**E.       The Storm Water Permit Monitoring and Reporting Requirements**

59.     The Storm Water Permit requires dischargers to develop and implement an adequate, written Monitoring and Reporting Program ("M&RP").  1997 Permit, §§ E(3), B(1); 2015 Permit §§ X(I), XI.  The primary objectives of the M&RP are to

14

ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, §§ B(2)(a), (b); 2015 Permit, §§ X(I), XI.

60.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP be revised as necessary to ensure compliance with the Storm Water Permit.

61.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility. 1997 Permit, § B(5). The 2015 Permit now mandates that facility operators collect and analyze storm water samples from four (rather than two) qualifying storm events ("QSEs") from all discharge locations over the course of the reporting year.  2015 Permit, §§ XI(B)(2), (3).  Dischargers must collect and analyze storm water samples from two QSEs during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).  2015 Permit § XI(B)(2).

62.     Dischargers must analyze each sample for pH, total suspended solids ("TSS"), oil and grease, and, under the 1997 Permit, for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities," and under the 2015 Permit, for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 1997 Permit, §

B(5)(c)(ii);  2015 Permit, § XI(B)(6)(c).

63.    Under the 2015 Permit, a facility must also analyze collected samples for "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix."  2015 Permit, § XI(B)(6)(d).

64.    Section B(5)(c)(iii) and Table D of the 1997 Permit and Section XI(B)(6) and Table 1 of the 2015 Permit require facilities classified as Standard Industrial Classification ("SIC") code 5093 (Scrap and Waste Materials), such as the Facility, to also analyze storm water samples for iron, lead, aluminum, copper, zinc, chemical oxygen demand ("COD").

65.    Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

66.    Dischargers are required to submit Annual Reports in July of each year. 1997 Permit, § B(14); 2015 Permit, § XVI. The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report") in which the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed.  The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge.  The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  2015 Permit, § XV.  Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This requirement is continued with the 2015 Permit.  2015 Permit,

COMPLAINT

Fact Sheet, p. 68, Paragraph O.

## V.   STATEMENT OF FACTS

### A. Prime Metals Facility

67.   Plaintiff is informed, believes, and thereon alleges that Prime Metals owns and operates the facility located at 6069 Maywood Avenue, Huntington Park, California 90255.

68.   Plaintiff is informed, believes, and thereon alleges the Facility is approximately 2.88 acres in size and is 100 percent impervious.

69.   LAW is informed, believes, and thereon alleges that, in its NOI submitted to the Regional Board, Defendant lists its standard industrial classification (SIC) code as 5093 for facilities engaged in scrap and waste materials.  The Facility belongs to Sector N of the Storm Water Permit.

70.   LAW is informed, believes, and thereon alleges the Facility receives scrap metal (ferrous and non-ferrous) such as cast iron, stainless steel, bushelling, and plate and structural from various industrial manufacturers, metal fabricators, and other scrap dealers and moves, separates, and loads the scrap metal for transport.

71.   LAW is informed, believes, and thereon alleges the Facility possesses the machinery to sort, shear, bale, and torch material.

72.   LAW is informed, believes, and thereon alleges the Facility has an ability to procure 4,000–5,000 metric tons of scrap metal every month.

73.   LAW is informed, believes, and thereon alleges particulates from operations, oil, grease, suspended solids, and metals such as aluminum, copper, iron, lead, and zinc materials are exposed to storm water at the Facility.

74.   LAW is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the Facility may settle onto the ground.  LAW is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and

17

other pollutants as it flows towards the storm water discharge locations.

75.    LAW is informed, believes, and thereon alleges that storm water is discharged from at least two discharge points at the Facility into storm water conveyance systems.

76.    The Facility discharges into storm water conveyance systems that discharge into Reaches 1 and 2 of the Los Angeles River, and ultimately into the Pacific Ocean via the Los Angeles River Estuary, Los Angeles Harbor, and San Pedro Bay.

77.    Information available to LAW indicates these Receiving Waters are waters of the United States.

78.    LAW is informed, believes, and thereon alleges that the Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in the Receiving Waters. Elevated levels of metals, nutrients, pathogens, and sediments have resulted in the inability of the Receiving Waters to support their beneficial uses.

**B. The Ace Recycling Facility**

79.    LAW is informed, believes, and thereon alleges that the Prime Metals Facility was formerly operating as the Ace Recycling Facility, owned and/or operated by Ace Recycling LLC and/or Ace Metals, LLC ("Ace Recycling").

80.    The State Board's letter dated November 30, 2012, which acknowledges receipt of the Ace Recycling Facility's NOI, identifies the facility name and address as "Ace Recycling, LLC, 6069 Maywood Ave, Huntington Park" and the operator as "Ace Recycling, LLC." Additionally, the letter lists the Waste Discharge Identification (WDID) number for the Ace Recycling Facility as 4-19I023952.

81.    The Ace Recycling Facility's NOI listed its SIC Code as 5093 (Scrap and Waste Materials).

82.    LAW is informed, believes, and thereon alleges that Ace Recycling conducted scrap metal storage and processing as well as other industrial activities that

18

require coverage under the Storm Water Permit at the Ace Recycling Facility.

83.   In 2012, LAW sent Ace Recycling a Notice Letter regarding prior Clean Water Act and Storm Water Permit violations at the Ace Recycling Facility. A true and correct copy of LAW's notice letter is attached as Exhibit B, and is incorporated by reference.

84.   Upon receiving LAW's Notice Letter, Ace Recycling filed a Notice of Termination and cancelled its registration with the Secretary of State.

85.   LAW is informed, believes, and thereon alleges that Prime Metals holds itself out as the successor to Ace Recycling and that the Prime Metals Facility is a mere continuation of the Ace Recycling Facility.

86.   Prime Metals' website states "Prime Metals Los Angeles (PMLA) was established in early 2010" and "In 2012, our output reached an average of 5K metric tons of material on a monthly basis."

87.   Section 1.7 of the Prime Metals Facility SWPPP notes "Storm water samples collected in 2012, 2013, and 2014 consistently showed that suspended solids generated by facility activities are potential pollutant sources."

88.   Shawn Kim, the Ace Recycling Facility manager, remains the manager of the Prime Metals Facility.

89.   LAW is informed, believes, and thereon alleges after the transfer of assets from Ace Recycling to Prime Metals, only Prime Metals remained.

90.   On information and belief, LAW alleges there is an identity of stock, stockholders, and directors between Ace Recycling and Prime Metals.

91.   On information and belief, LAW alleges Prime Metals did not provide adequate consideration for acquisition of Ace Recycling's assets.

92.   Therefore, LAW is informed, believes, and thereon alleges Prime Metals has assumed the assets and liabilities of its predecessor, Ace Recycling. *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28.

93.   Prime Metals is therefore liable for all prior Clean Water Act and Storm

Water Permit violations of its predecessor, Ace Recycling.

**C. Past and Present Industrial Activity at the Facility**

94.    LAW is informed, believes, and thereon alleges that Defendant engages in the recycling of scrap metal.

95.    LAW is informed, believes, and thereon alleges that the Facility receives scrap metal by truck and loads the scrap metal into shipping containers for export.

96.    LAW is informed, believes, and thereon alleges that Defendant engages in the use of stationary and mobile equipment to move and separate material and transport material to the Facility's Storage Areas.

97.    LAW is informed, believes, and thereon alleges that Defendant engages in maintenance and repair activities at the Facility.

98.    The potential pollutants sources associated with industrial activities at the Facility include, but are not limited to: the Steel Storage Area, outdoor Storage Areas; Paved Vehicle/Equipment Parking and Storage Areas; Mobile Fuel Storage Tank(s) and Fueling Area; Municipal Garbage Dumpster; Loading and Unloading Areas; Maintenance Building; and the on-site material handling equipment.

99.    Plaintiff is informed, believe, and thereon allege that pollutants present in storm water discharged from the Facility therefore include but are not limited to: toxic metals such as copper, iron, zinc, lead, and aluminum; petroleum products including oil, fuel, grease, transmission fluids, brake fluids, hydraulic oil and diesel fuel; lubricants; dissolved solids; total suspended solids and chemical oxygen demand and pH-affecting substances; hazardous waste; and fugitive and other dust, dirt and debris.

100.    Based upon LAW's investigation, LAW is informed, believes, and thereon alleges that Defendant stores metal and other materials outside where they are exposed to storm water.

101.    LAW is informed, believes, and thereon alleges that there are at least two discharge points at the Facility that convey storm water pollution off the site and into area storm water conveyance systems.

COMPLAINT

102.   LAW is informed, believes, and thereon alleges that the Facility lacks effective BMPs to control the flow of storm water from the Facility into storm water conveyance systems.

103.   Suspended solids, metal particles, and other pollutants have been and continue to be conveyed from the Facility into storm drain conveyance systems.

104.   LAW is informed, believes, and thereon alleges that during rain events at the Facility, storm water carries pollutants from the outdoor storage areas, dumpsters, maintenance area; vehicle/equipment parking and storage areas; mobile fuel storage tank(s); fueling area; loading and unloading areas; equipment, and other sources directly into the storm drain conveyance systems.

105.   LAW is informed, believes, and thereon alleges that the Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the Facility.

**D. The Facility and its Associated Discharge of Pollutants**

106.   LAW is informed, believes, and thereon alleges that with every significant rain event, the Facility discharges polluted storm water from the industrial activities on site via the City of Huntington Park's storm drain system and into the Receiving Waters.

107.   LAW is informed, believes, and thereon alleges that the Receiving Waters into which the Facility discharges polluted storm water are waters of the United States and therefore the Storm Water Permit properly regulates discharges to those waters.

108.   Because discharges from the Facility contain particulates and metals, the Facility's polluted discharges cause and/or contribute to the impairment of water quality in the Receiving Waters.

109.   LAW is informed, believes, and thereon alleges that the storm water discharged from the Facility, during both Prime Metals and Ace Recycling's ownership/operation of the Facility, has exceeded the CTR Water Quality Standards

21

applicable to zinc, lead, and copper in California.

110.   LAW is informed, believes, and thereon alleges that the storm water discharged from the Facility has also exceeded the EPA Benchmark values for iron, aluminum, total suspended solids, and COD during Prime Metals' ownership/operation of the Facility.

111.   LAW is informed, believes, and thereon alleges that the storm water discharged from the Facility has also exceeded the EPA Benchmark values for iron, aluminum, total suspended solids, COD, pH, specific conductance, and oil and grease during Ace Recycling's ownership/operation of the Facility.

112.   LAW is informed, believes, and thereon alleges that during every significant rain event that has occurred at the Facility, Defendant has discharged and continues to discharge storm water from the Facility that contains pollutants at levels in violation of the prohibitions and limitations set forth in the Storm Water Permit and other applicable WQS.

113.   LAW is informed, believes, and thereon alleges, from visual observations, sample results, and investigations available to LAW, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Facility.

114.   The inadequacy of the BMPs at the Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP for the Facility.

115.   Storm water discharges from the Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable WQS.

116.   LAW is informed, believes, and thereon alleges that Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT at the Facility in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation I.D. and V.A. of the 2015 Permit.

117.   Each day that Defendant has failed and continues to fail to implement

COMPLAINT

adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Storm Water Permit and the Clean Water Act.

118.   Based on its investigation of the Facility, LAW is informed, believes, and thereon alleges that Defendant has failed to develop and implement an adequate SWPPP since at least December 2, 2011 through the present.

119.   Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Storm Water Permit and the Act.

120.   LAW is informed, believes, and thereon alleges that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the Facility since at least December 2, 2011, in violation of Receiving Water Limitations C(3) and C(4) of the 1997 Permit and 2015 Permit Receiving Water Limitations VI(A) through C.

121.   Each day that Defendant has operated the Facility without meeting this reporting requirement of the Storm Water Permit constitutes a separate violation of the Storm Water Permit and the Clean Water Act.

**E.  Monitoring Program**

   **i.  *Prime Metals' Monitoring***

122.   LAW is informed, believes, and thereon alleges that despite the extremely high levels of pollutants reported in the samples that were taken at the Facility, the Defendant has not sampled and submitted sampling reports for the 2015–2016 reporting year as required under the Storm Water Permit.

123.   LAW is informed, believes, and thereon alleges that Defendant failed to analyze storm water samples from each discharge location for two QSEs during the first half of the 2015–2016 reporting year and two QSEs during the latter half as required under Section XI(B)(2) of the 2015 Permit, despite the occurrence of additional QSEs during the 2015–2016 reporting period.

124.   LAW is informed, believes, and thereon alleges that Defendant failed to

report "all sampling and analytical results for all individual samples" to SMARTS within 30 days of obtaining the results. 2015 Permit § XI(B)(11)(a).

125.   LAW is informed, believes, and thereon alleges that Defendant failed to analyze all storm water samples collected for all required parameters, including Oil and Grease, a minimum parameter required under the Storm Water Permit. 2015 Permit, § XI(B)(6).

126.   LAW is informed, believes, and thereon alleges that Defendant failed to comply with Section XV of the 2015 Permit by failing to complete proper ACSCE Reports as well as proper Annual Evaluations for the Facility.

127.   LAW is informed, believes, and thereon alleges that Defendant did not provide the Regional Board with any advanced notice of anticipated noncompliance with the Storm Water Permit as required by Section XXI(M) of the 2015 Permit.

### ii.   *Ace Recycling's Monitoring*

128.   LAW is informed, believes, and thereon alleges that despite the extremely high levels of pollutants reported in the samples that were taken at the Facility, Ace Recycling did not sample or submit sampling reports for as required under the Storm Water Permit.

129.   LAW is informed, believes, and thereon alleges that from December 2, 2011 through June 30, 2015, Ace Recycling failed to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth in Section B(5) of the 1997 Permit.

130.   LAW is informed, believes, and thereon alleges that Ace Recycling failed to analyze all storm water samples collected for all required parameters.

131.   Information available to LAW indicates that Ace Recycling did not submit any reports pursuant to Receiving Water Limitation C(4)(a) within 60 days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable WQS, or file any reports describing the Facility's noncompliance with the Storm Water Permit pursuant to Section C(11)(d) of the 1997 Permit and Section

24

XXI(M) of the 2015 Permit.

LAW is informed, believes, and thereon alleges that as its successor, Prime Metals is liable for Ace Recycling's violations of the Storm Water Permit.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of the Storm Water Permit Effluent Limitations and the Clean
Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

132.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

133.   LAW is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

134.   LAW is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the Act. 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

135.   Defendant violates and will continue to violate the Storm Water Permit Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

136.   LAW is informed, believes, and thereon alleges, that Defendant's violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

137.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

138.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the Act occurring from December, 2011 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

139.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm LAW has no plain, speedy, or adequate remedy at law.

140.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

141.   LAW incorporates the allegations contained in the above paragraphs as though fully set forth herein.

142.   LAW is informed, believes, and thereon alleges that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

143.   LAW is informed, believes, and thereon alleges that storm water containing levels of pollutants that cause or contribute to exceedances of water quality

COMPLAINT

standards has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

144.   Defendant violates and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, or that cause or contribute to exceedances of WQS, discharges from the Facility.

145.   LAW is informed, believes, and thereon alleges that Defendant's violations of Receiving Water Limitations of the Storm Water Permit and the Act are ongoing and continuous.

146.   Each and every violation of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the Act. 33 U.S.C. § 1311(a).

147.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the Act occurring from December 2, 2011 to the present, pursuant to Sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

148.   An action for injunctive relief under the Clean Water Act is authorized by section 505(a). 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LAW, LAW's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

149.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

/././

/././

COMPLAINT

**THIRD CAUSE OF ACTION**

**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollution Prevention Plan in Violation of
the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

150.   LAW incorporates the allegations contained in the above paragraphs as though fully set forth herein.

151.   LAW is informed, believes, and thereon alleges that Defendant has failed and continues to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

152.   LAW is informed, believes, and thereon alleges that Defendant has failed and continues to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

153.   LAW is informed, believes, and thereon alleges that Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

154.   Defendant has been in violation of the Storm Water Permit at the Facility every day from December 2, 2011 to the present.

155.   Defendant's violations of the Storm Water Permit and the Act at the Facility are ongoing and continuous.

156.   Defendant will continue to be in violation of the Storm Water Permit and the Act each and every day the Defendant fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

157.   Each and every violation of the Storm Water Permit SWPPP requirements at the Facility is a separate and distinct violation of the Act.

158.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the Act occurring from December 2, 2011 to the present, pursuant to Sections 309(d) and 505

28

of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

159.   An action for injunctive relief under the Act is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

160.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

161.   LAW incorporates the allegations contained in the above paragraphs as though fully set forth herein.

162.   LAW is informed, believes, and thereon alleges that Defendant has failed and continues to fail to develop an adequate M&RP for the Facility, in violation of the Storm Water Permit.

163.   LAW is informed, believes, and thereon alleges Defendant has failed and continues to fail to adequately implement an M&RP for the Facility, in violation of the Storm Water Permit.

164.   LAW is informed, believes, and thereon alleges, that Defendant has failed and continues to fail to adequately revise an M&RP for the Facility, in violation of the Storm Water Permit.

165.   Defendant has been in violation of the Storm Water Permit's monitoring

29

COMPLAINT

requirements at the Facility every day from December 2, 2011 to the present.

166. Defendant's violations of the Storm Water Permit's monitoring requirements and the Act at the Facility are ongoing and continuous.

167. Defendant will continue to be in violation of Section B and Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the Act each and every day it fails to adequately develop, implement, and/or revise an M&RP for the Facility.

168. Each and every violation of the Storm Water Permit M&RP requirements at the Facility is a separate and distinct violation of the Act.

169. By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the Act occurring from December 2, 2011 to the present, pursuant to Sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

170. An action for injunctive relief under the Act is authorized by Section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LAW, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

171. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

/./././

/./././

/./././

/./././

/./././

/./././

# FIFTH CAUSE OF ACTION

**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

172.   LAW incorporates the allegations contained in the above paragraphs as though fully set forth herein.

173.   LAW is informed, believes, and thereon alleges that Defendant has failed and continues to fail to submit accurate and complete Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit and Sections XV and XVI of the 2015 Permit.

174.   LAW is informed, believes, and thereon alleges that Defendant's Annual Reports failed to meet the monitoring and reporting requirements of the Storm Water Permit.

175.   Defendant has been in violation of Sections B(14), C(9), C(10), and/or C(11) of the 1997 Permit, Sections XV and XVI of the 2015 Permit, and the Act every day since at least December 2, 2011.

176.   Defendant's violations of the reporting requirements of the Storm Water Permit and the Act are ongoing and continuous.

177.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the Act occurring from December 2, 2011, to the present, pursuant to Sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

178.   An action for injunctive relief under the Act is authorized by Section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LAW, LAW's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

179.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

180.   Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendant to have violated and to be in violation of the Act as alleged herein;

b.   A Court order enjoining Defendant from discharging polluted storm water from the Facility unless authorized by the 2015 Permit;

c.   A Court order enjoining Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d.   A Court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

e.   A Court order requiring Defendant to comply with the Storm Water Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   A Court order assessing civil monetary penalties for each violation of the Act of up to $37,500 per day per violation for each violation of the Act since October 28, 2011, up to and including November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

g.   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

/././

COMPLAINT

1     h.     Any other relief as this Court may deem appropriate.

2

3   Dated: February 14, 2017          Respectfully submitted,

4                                     COAST LAW GROUP LLP

5                                     By: s/ Chris C. Polychron

6                                     CHRIS C. POLYCHRON

7                                     Attorney for Plaintiff
                                      LOS ANGELES WATERKEEPER
8                                     E-mail: chris@coastlawgroup.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33

COMPLAINT